UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| GILKINSON FARMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 22-229-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| THE ANDERSONS, INC., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Andersons, Inc. ("The Andersons") instituted arbitration proceedings with the National Grain and Feed Association ("NGFA") on March 31, 2022, following its allegation that Gilkison Farms, LLC ("Gilkison") defaulted on its contractual obligations to deliver grain. Gilkison then filed suit in the Clark Circuit Court, alleging that The Andersons had fraudulently induced it to enter contracts for the sale of grain and that it was not obligated to arbitrate the contract disputes. The Andersons removed the case to this Court on September 7, 2022, and filed a motion to compel arbitration and stay or dismiss the case.

Because the parties' Customer Flex Agreement includes a broad arbitration provision that applies to the contract disputes at issue, The Andersons' motion to compel arbitration and stay the case will be granted.

I.

The Andersons is a grain merchandising company that operates multiple grain elevators throughout the United States. Gilkison is a farm located in Winchester, Kentucky that raises and sells grain crops to third-party buyers. Non-party Boyd Brooks is a cash grain broker and

advisor who assists farmers with marketing and selling their crops.[1] Gilkison (through an unnamed agent) met Brooks at the Kentucky Commodity Conference in 2017. Sometime thereafter, it learned that Brooks was an agent of The Andersons. Brooks advised Gilkison that he could coordinate the sale of grain from Gilkison to The Andersons and, by 2019, The Andersons was purchasing corn and soybeans from Gilkison through Brooks. [Record No. 1-2 ¶ 11] Gilkison did not receive any documentation at the time of the transactions and shipments, but created a spreadsheet in an attempt to keep track of outgoing shipments and their delivery destinations.

Gilkison contacted Brooks in December 2019 concerning shipments that The Andersons had picked up but for which Gilkison had not been paid. The Andersons subsequently sent Gilkison a December 23, 2019, customer status report showing the questioned payments as "unpaid" or "on hold." The Andersons provided Gilkison an updated list in January 2020. This list included some handwritten notes but did not reflect any additional payments to Gilkison. Gilkison asked Brooks in the fall of 2020 about the status of the contracts. But Brooks advised that "no outstanding contracts existed" and Gilkison "had no future contracts out and was not subject to future financial exposure related to contracts with The Andersons." *Id.* ¶ 17.

Brooks presented Gilkison with a contract styled "Customer Flex Agreement" on September 23, 2020. [Record No. 1-1, pp. 13-15] When Gilkison asked Brooks the purpose of the Customer Flex Agreement, Brooks "advised that it was to clean up past grain

---

[1] Gilkison Farms, LLC and others filed a related lawsuit against Brooks and his company, Aletheia Risk Management, LLC, which was dismissed on August 2, 2022. *See Alford, et al. v. Brooks, et al.,* Lexington Civil Action No. 22-063.

transactions that had not been timely memorialized." [Record No. 1-2 at p. 5]  The Customer Flex Agreement provides, in relevant part:

> 1.      Customer and The Andersons, Inc. ("Andersons") warrant and agree that all contracts and their amendments (collectively, "Contracts") are cash contracts for the delivery of agricultural products.  All Contracts will be governed by the Standard Purchase Contract Terms on the reverse side of each Purchase Contract and Confirmation, along with applicable Grain Trade Rules of the National Grain and Feed Association, as amended from time to time ("NGFA Grain Trade Rules"), and this Customer Flex Agreement ("Agreement").
>
> 2.      Both parties agree: **(A) CONTRACTS ARE MADE IN ACCORDANCE WITH THE APPLICABLE NGFA GRAIN TRADE RULES (A COPY WILL BE SUPPLIED UPON REQUEST) EXCEPT AS MODIFIED BY IN THE CONTRACTS, AND (B) ANY DISPUTES OR CONTROVERSIES ARISING OUT OF CONTRACTS SHALL BE ARBITRATED BY THE NATIONAL GRAIN AND FEED ASSOCIATION, PURSUANT TO ITS ARBITRATION RULES.  THE DECISION AND AWARD DETERMINED THROUGH SUCH ARBITRATION SHALL BE FINAL AND BINDING UPON THE BUYER AND SELLER.  JUDGMENT UPON THE ARBITRATION AWARD MAY BE ENTERED AND ENFORCED IN ANY COURT HAVING JURISDICTION THEREOF.**

Gilkison representative Brennan Gilkison signed the Customer Flex Agreement on September 23, 2020.

The Andersons asked Gilkison to sign 20 individual grain sales contracts on January 12, 2021.  The contracts were sent as a single email attachment.  With a few exceptions, each contract consisted of a single page, the bottom of which read "page 1 of 2." [2]  Gilkison's representative signed the bottom of page one, just below a provision stating: "**PARTIES ACCEPT ADDITIONAL TERMS ATTACHED.**" [3]  According to The Andersons, the

---

[2]     A handful of the contracts read "page 1 of 4," but the second page purportedly was missing. [Record No. 7, p. 11]

[3]     Gilkison disputes that it signed at least one of the contracts, numbered QX30095.

additional terms on the second page included an arbitration agreement. [*See* Record No. 1-2, p. 53 ¶ 2.] However, Gilkison contends it did not receive a second page to any of the contracts until after they were executed. According to Gilkison, Brooks advised it that the 20 contracts were not "new," but were intended to "clean up the previous transactions which had not been executed and had already been delivered." The Andersons agrees that the contracts were intended to memorialize prior agreements that had not been committed to writing, but maintain that they pertained to future deliveries of corn, soybeans, and wheat.

In February 2022, The Andersons became concerned that Gilkison would not fulfill its purported delivery obligations under the January 12 contracts. And The Andersons contends that Gilkison subsequently failed to provide adequate assurances when it asked for them, thereby repudiating the contracts. The Andersons canceled the contracts at market value and invoiced Gilkison for the resulting damages. It then initiated arbitration with the NGFA on or around April 14, 2022, following Gilkison's refusal to pay. [*See* Record No. 4-4, p. 4.] Gilkison filed suit in the Clark Circuit Court on August 22, 2022, seeking a declaratory judgment that the contracts are unenforceable based on fraudulent inducement and incompleteness. Gilkison also seeks to stay the arbitration proceeding, arguing that there is no valid agreement to arbitrate the contract dispute. The Andersons removed the action to this Court and filed a motion to compel arbitration.

## II.

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate disputes arising out of a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract." 9 U.S.C. § 2. If a party who signed an arbitration contract refuses to arbitrate, the

aggrieved party may file a motion with the Court to compel arbitration. 9 U.S.C. § 4. When considering a motion to compel arbitration under the Act, a court has four tasks: it must determine whether the parties agreed to arbitrate; it must determine the scope of the agreement; if federal statutory claims are asserted, it must consider whether Congress intended those claims to be non-arbitrable; and, if the court concludes that some, but not all, of the claims are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000).

In determining whether the parties agreed to arbitrate, the Court examines arbitration language in a contract in light of the strong federal policy in favor of arbitration and resolves any doubts about the parties' intentions in favor of arbitration. *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006). But despite the strong policy in its favor, arbitration under the FAA is "a matter of consent, not coercion." *Volt Info. Scis., Inc.. v. Bd. of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). Although ambiguities in the language of the agreement will be resolved in favor of arbitration, the clear intent of the parties will not be overridden simply because the policy favoring arbitration is implicated. *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).

When determining whether parties have agreed to arbitrate a certain matter, courts generally apply ordinary state-law principles that govern the formation of contracts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). However, courts apply the summary judgment standard under Rule 56 of the Federal Rules of Civil Procedure when ruling on a motion to compel arbitration. *See Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) (stating "the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate, a showing that mirrors the summary

judgment standard"). If the district court is satisfied that the agreement to arbitrate is not "in issue," it must compel arbitration. Conversely, if the court finds that the validity of the arbitration agreement is " in issue," the matter must proceed to trial to resolve the question. *Id.*

While a claim of fraudulent inducement will allow a party to avoid an arbitration clause if the fraud claim goes to the arbitration clause itself, a fraudulent inducement claim relating to the *entire* agreement will be sent to the arbitrator if the arbitration clause encompasses claims of fraud. *Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 403-04 (1967); *Saneii v. Robards*, 187 F. Supp. 2d 710, 713 (W.D. Ky. 2001);

### III.

Gilkison focuses on the allegedly incomplete agreements it signed on January 12, 2021, in insisting that no agreement to arbitrate exists. Specifically, it maintains that it could not have agreed to the "additional term" requiring arbitration when it was not provided that term at the time of contract formation. But Gilkison fails to account for the significance of the arbitration clause included in the Customer Flex Agreement. As this Court recently observed in *Furnwood Farm, LLC v. The Andersons, Inc.*, 5: 22-CV-227, 2022 WL 16703133, at *4 (E.D. Ky. Nov. 3, 2022), the Flex Agreement's arbitration provision is broadly drafted to include "all [cash] contracts and their amendments … for the delivery of agricultural products."

It is undisputed that the Customer Flex Agreement predates each of the individual written contracts at issue, as it was executed on September 23, 2020. Gilkison suggests that the Flex Agreement does not cover these contracts because they are based on oral agreements that occurred in 2019. However, the Flex Agreement's broad language supports a finding that

the parties intended to arbitrate disputes arising out of contracts predating the Flex Agreement. *See id.* (citing *Orvil Nelson & Co., Inc. v. All Am. Homes of Tenn.*, 2008 WL 11347938 (E.D. Ky. Apr. 3, 2008)). Further, like the plaintiff in *Furnwood*, Gilkison understood that the purpose of the Flex Agreement was to "clean up" past transactions that had not been memorialized. Thus, it would make little sense to conclude that the Flex Agreement's arbitration clause does not apply to those same transactions.

Having concluded that the parties agreed to arbitrate, the Court must examine the scope of the arbitration agreement. The Flex Agreement provides that the parties will arbitrate "any disputes or controversies" arising out of the parties' cash contracts for the delivery of agricultural products. Gilkison's claims easily fall within the scope of the agreement, as it alleges that Brooks, acting as The Andersons' agent, fraudulently induced it to enter into contracts for the sale of grain. Gilkison also contends that, after creating the contracts, The Andersons unilaterally formed agreements "to roll [the] contracts for delivery and pricing periods in the future" without Gilkison's consent. Finally, Gilkison alleges that The Andersons breached its duty of good faith and fair dealing with respect to its conduct surrounding the contracts. Gilkison also seeks a declaratory judgment that the contracts are unenforceable.

Finally, the Court must decide whether to stay or dismiss the action.[4] The FAA provides that, after determining that a case is referrable to arbitration, a court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Since The Andersons has requested a stay, the Court will stay and not dismiss the matter pending arbitration.

---

[4] Gilkison has not asserted any federal statutory claims; therefore, the Court need not consider the third step under *Stout*, 228 F.3d at 714.

## IV.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1. The Andersons, Inc.'s motion to compel arbitration [Record No. 4] is **GRANTED**.

2. Gilkison Farms, LLC's motion to stay arbitration [Record No. 6] is **DENIED**.

3. Subject to intervening orders, this matter is **STAYED** pending the completion of arbitration in accordance with the terms of the parties' agreement.

4. The parties are directed to file a joint status report every 60 days, commencing 60 days from this date.

Dated: November 17, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky

Case: 5:22-cv-00229-DCR   Doc #: 14   Filed: 11/17/22   Page: 9 of 9 - Page ID#: 382

- 9 -